MACK DAVID and BEATRICE DAVID, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
David v. Commissioner
Docket No. 3511-72.
United States Tax Court
T.C. Memo 1976-316; 1976 Tax Ct. Memo LEXIS 87; 35 T.C.M. (CCH) 1436; T.C.M. (RIA) 760316; October 7, 1976, Filed *87 Petitioner contributed his working papers and other memorabilia to the University of Southern California in 1968 and 1969. Held, the fair market value of donated materials determined. Ronald J. DeFelice and Peter L. Grosslight, for the petitioners. Stephen W. Simpson and O. Richard Skopil, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1968 and 1969 in the amounts of $28,342 and $19,895, respectively. The only issue we must decide is the fair market value of property donated to the University of Southern California in the years before us. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits *88 attached thereto are incorporated herein by this reference. Petitioners Mack David and Beatrice David, husband and wife, resided in Beverly Hills, Calif., at the time of filing the petition herein. Beatrice David is a party to these proceedings solely by virtue of having filed joint income tax returns with her husband for the years in question. Accordingly, the designation "petitioner" will hereafter refer only to Mack David. Petitioner, Mack David, is a composer and lyricist of popular music, with the majority of his work being done as a lyricist. Additionally, he has written and produced television shows and orchestrated motion pictures. Petitioner's career spans more than 40 years, beginning with his first published song, "Rain, Rain Go Away," a Tin Pan Alley "hit," in 1932. He has written many popular tunes of the 1940's, 1950's, and 1960's, and many theme songs for motion pictures and television. His material has been recorded and performed by such artists as Ella Fitzgerald, Perry Como, Dinah Shore, Vikki Carr, Tony Martin, Tommy Dorsey, the Mills Brothers, Bing Crosby, Frankie Lane, Sammy Davis, Jr., Andy Williams, and many others. A small listing of the songs he has *89 written (either as lyricist or as composer and lyricist) includes: [1]
"La Vie En Rose" "Sunflower" "I Don't Care if the Sun Don't Shine" "A Sinner Kissed an Angel" "Moon Love" "On the Isle of May" "Bibbi-Di-Bobbi-Di-Bo," from the Walt Disney movie "Cinderella" "Tara's Theme," from the movie "Gone With the Wind" "It's a Mad, Mad, Mad, Mad World," from the movie with the same name "To Kill a Mockingbird," from the movie with the same name "Hush, Hush, Sweet Charlotte," from the movie with the same name "Lili Marlene" "Hawaiian Eye," from the television series with the same name "The Bird Man," from the movie "Bird Man of Alcatraz" For some of his songs petitioner composed both the music and the lyrics. For others he composed either the music or the lyrics, but not both. And for still others he composed both the music and the lyrics in collaboration with third persons. In all, Mr. David has written over 700 songs and has an excellent reputation among his colleagues in the popular music field. In 1934 petitioner was elected to the lowest classification *90 in the American Society of Composers, Authors and Publishers (ASCAP). By 1949 petitioner had ascended to the top classification in the ASCAP rating system, joining the likes of Irving Berlin, Jerome Kern, Cole Porter, George Gershwin, Richard Rodgers and others. Petitioner has remained in that top classification ever since. Generally speaking, the more an individual writer's songs are performed the higher ASCAP classification he achieves. The top classification in ASCAP has maintained, for the last 25 years, approximately 100 to 125 lyricists and composers. Those in this classification are sometimes known as the "super dreadnaughts." ASCAP's total membership during the years in issue was approximately 10,000 members. Petitioner has received "Gold Records" for some of his works and has been nominated for the Academy Award eight times. He has never received an Academy Award, but he has received the Motion Pictures Exhibitor Award six times. In October 1967, petitioner was contacted by Dr. Robert Knutson of the University of Southern California regarding the possible contribution of petitioner's original working papers and other memorabilia to the university library. Petitioner *91 was solicited for the contribution because of his reputation as a songwriter and the university's desire to document the history of popular music and popular culture. In connection with the contribution, Dr. Knutson suggested that petitioner contact Milton Luboviski to have his materials appraised. During 1968 petitioner donated certain physical assets described as "music manuscripts," "contracts," "printed scores," "printed songs," "scripts," "research notebooks," "photographs," and "historical material" to the University of Southern California. On December 1, 1968, Mr. Luboviski appraised the value of these assets at $66,380. [2]
In April 1969, petitioner donated additional music manuscripts to the University of Southern California. Mr. Luboviski appraised these donated manuscripts on April 24, 1969, at a value of $31,915. In May 1969, petitioner made a third donation to the University of Southern California of various materials described as "music manuscripts," "picture *92 cost reports," "cost sheets," "cast sheets," "correspondence," "hours," "production reports," "scripts notes," "shooting schedules," "scripts," "photographs," "pen and ink drawings," "letters," "phonograph records," "transcriptions," and "tapes." Mr. Luboviski appraised these materials on October 9, 1969, at a value of $21,685. Much of the material donated by petitioner was "autograph" material. The term "autograph" as used herein refers to material written in the hand of the author or composer thereof and not merely a signature. Examples include handwritten letters, scripts, musical manuscripts, etc. The following property rights were not conveyed by any of the three donations: copyrights, rights of publication in book form, rights of serialization, newspaper and magazine rights, reprint rights, book club rights, or dramatization rights. The university obtained no rights of commercial exploitation of any of the donated materials. On his income tax returns for 1968 and 1969 petitioner claimed charitable contributions of $66,480 and $53,600, respectively, for the materials donated to the University of Southern California. Respondent disallowed the deductions taken with *93 respect to these contributions claiming petitioner did not own the donated materials at the time of the gifts. Respondent now concedes petitioner owned all the materials donated, but contends that the fair market value of the materials contributed in 1968 and 1969 did not exceed $15,203 and $8,294, respectively. Petitioner's first appraiser and expert witness, Milton Luboviski, is the owner and operator of the Larry Edmunds Bookshop in Hollywood, Calif. Mr. Luboviski has operated his business for over 30 years. His shop buys and sells only materials dealing in the performing arts. This includes everything dealing with motion pictures except the actual films themselves. He sells books, magazines, posters, autographs, autographed letters, autographed photographs, and more. He is widely known in his field. Mr. Luboviski is a member of the Antiquarian Book-sellers Association of America, as well as the Appraisers Association of America. He has appraised materials similar to those in the present case for artists such as Harry Ruby, Maurice Jarre [3] and others. Altogether, he has made about 125 appraisals.
In *94 making his appraisals in this case, Mr. Luboviski relied primarily on what he considered "comparable" sales; [4] including sales made in his own shop and sales recorded in catalogs and auction records from all over the world. [5] The sales which Luboviski felt were comparable were those of contemporary composers such as Benjamin Britten, George Gershwin, William C. Handy, Kurt Weill, Georges Auric, Cole Porter, Andre Previn, Arnold Schoenberg and others. Mr. Luboviski appraised each item of donated material separately and then totaled those values to arrive at a value for each of the three donations in question. His fee for making the appraisals was established before the appraisals were made at three *95 percent of the appraised value. In 1973 petitioner's second expert, James Dolan, appraised the value of the three separate gifts at $56,280, $23,565 and $18,935, respectively. Mr. Dolan is the music librarian for the Los Angeles Music Center and the Los Angeles Philharmonic Orchestra. He has been a music librarian for Arthur Fiedler and the Boston Pops Orchestra and for Arturo Toscanini and the National Broadcasting Company Symphony Orchestra. He has also worked for Richard Rodgers of Rodgers and Hammerstein. In analyzing Mr. David's reputation and popularity, Mr. Dolan relied, almost exclusively, on the ASCAP classification system, which rated petitioner in the same class with George and Ira Gershwin, Jerome Kern, Oscar Hammerstein, Richard Rodgers, and others. Respondent's first expert was Mrs. Doris Harris, the owner and operator of Doris Harris Autographs in San Pedro, Calif. Mrs. Harris has been dealing in autograph materials (mainly original letters, documents and manuscripts) for over 20 years in the fields of literature, science, music, theatre, politics and the military. She is a member of the Antiquarian Booksellers Association of America, served on its board *96 of governors for three years, and was elected chairman of the southern California chapter. She is also on the council of the Friends of U.C.L.A., an organization which raises money for the "Special Collections" division of the library at the University of California at Los Angeles. The only appraisal done by Mrs. Harris before she appraised the material in this case was a collection of historical material donated to Stanford University. Mrs. Harris appraised petitioner's donations in November 1970. At that time, sales of popular culture material, such as Mr. David's, formed a very minor part of her total sales. In making her appraisal Mrs. Harris consulted many catalogs from around the world listing sales of musical manuscript material. Composers which Mrs. Harris compared to Mr. David include: Franz Liszt, Beethoven, Cesar Franck, Mendelssohn, Paul Hindemith, Wagner, Max Bruch, Dvorak, Offenbach, Honegger, Benjamin Britten, Sibelius, and others. Mrs. Harris used Mr. Luboviski's inventory and appraisal as a guideline in making her own appraisal of the donated materials. She did not view each and every piece of material in the collection, but rather looked at enough of *97 the material to satisfy her of the value of the whole. The fair market values (at the time of donation) arrived at by Mrs. Harris were $8,450 for the materials donated in 1968 and $5,035 for the materials donated in 1969. [6]
Respondent's second expert was Malcolm Willits, owner and operator of the Collectors Book Store in Hollywood, Calif. Mr. Willits is a dealer in movie material, science fiction material, and comic art. More specifically, he deals in movie and television scripts, photographs, and related production materials. He has been in the business for almost ten years. Prior to making his appraisal of petitioner's memorabilia, Mr. Willits had made approximately 25 appraisals. [7] In the present case he did not appraise all of the donated materials, but rather only a portion thereof: movie scripts, television scripts, material related to those scripts, still photographs, Disney drawings, radio transcriptions, tapes and records. Mr. Willits valued the *98 movie scripts donated in 1968 at $980 at the time of their contribution. This same material was appraised by Mrs. Harris at $400 and by Mr. Luboviski at $5,250. For the television scripts and related memorabilia, photographs, Disney drawings, correspondence, records, tapes and radio transcriptions donated in 1969, Mr. Willits appraised their value at the time of contribution at $1,787. Mrs. Harris appraised these same materials at $2,285 and Mr. Luboviski appraised them at $13,970. Petitioner has never offered for sale nor has anyone ever offered to purchase from him any of his working manuscripts or other related memorabilia. OPINION The only issue we have to decide is the fair market value of various materials (comprising three separate gifts) donated by petitioner to the University of Southern California during the calendar years 1968 and 1969. Petitioner contends that the fair market values of the three donations are: $66,380 for the donation made in 1968, and $31,915 and $21,685 for the respective donations made in 1969. Respondent on the other hand argues that the fair market values of the materials donated in 1968 and 1969 were no more than $15,203 and $8,294, *99 respectively. [8]
For charitable contributions made in property other than money, fair market value is defined in section 1.170-1(c)(1), Income Tax Regs., which provides: * * * If a contribution is made in property other than money, the amount of deduction is determined by the fair market value of the property at the time of contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * See also William H. Mauldin,60 T.C. 749, 758 (1973). The issue is one of fact and must be decided from all the relevant evidence in the record. Philip Kaplan,43 T.C. 663, 665 (1965). For musical manuscripts and other related memorabilia, such as we have before us, some of the factors that must be considered in making a value judgment are: * * * the composer's standing in his field and popularity of his works in general; the critical acclaim and popular appeal of the particular works contributed; *100 the relative place and importance of the contributed works in the composer's career; the condition and content of the contributed works; whether the works are originals, fair copies, or photocopies, are written in the composer's own hand, are signed, or are in ink, pencil, or typed; the length of the individual contributed tributed works and the sizes of the pages containing them; whether the mental processes of the composer are shown * * *, including annotations; the demand in the market place for the type of works contributed and for the particular works contributed; the associative character of the contributed works (such as the film, its actors and actresses, its director, or its subject); the quantity, or conversely the rarity, of the contributed material * * *; and the length of time necessary to sell the contributed works. [Maurice Jarre,64 T.C. 183, 188 (1975).] [9]
Listing such factors, however, does not bring us any closer to a dollar value for the donated materials. Translating these factors into dollar figures is the job of experts, and we must necessarily rely on their testimony *101 to reach our decision. We face the difficult task of appraising the appraisers. In weighing the testimony and appraisals of the various experts presented, we have again followed our opinion in Maurice Jarre,64 T.C. 183, 188-189 (1975), and considered the following: * * * their demonstrated qualifications to form an opinion, their familiarity with the background and relative place of * * * [Mr. David] in his field, their choices of comparable sales, their familiarity and contact with the potential market for the contributed material, and their knowledge of the material. We also have considered the expert witnesses' relative expertise as judged and observed by us, the time spent on and thoroughness of their appraisals, and their knowledge of the particular field both before and after research. * * * There are so many variables operating in the value equation that an appraisal of the property donated by petitioner necessitates some estimation. We have kept this in mind in evaluating the appraisals offered into evidence and in arriving at our final conclusions as to value. Petitioner has done an admirable job of discrediting respondent's witnesses. The *102 thoroughness of their research and relative expertise in the popular music field leaves us with doubt as to the accuracy of their appraisals. In one instance a predisposition to low valuation existed before an analysis of the donated materials was made. Respondent's experts have not demonstrated a great deal of familiarity with the general market for material such as that donated by petitioner and much of their knowledge was second hand. [10]
Mr. Luboviski (petitioner's expert), on the other hand, has had a long career of dealing in material of the type before us or closely related thereto. His familiarity with the market is extensive. His day-to-day sales and experience have given him greater firsthand knowledge of the market for this type of material than any of the other experts. In fact, respondent's experts who testified as to value used Mr. Luboviski's inventory of the donated materials and his business catalog of prices as guides in making their evaluations. *103 However, we think there is cause to believe Mr. Luboviski's appraisals are excessive. Mr. Luboviski valued each and every item donated and totaled these figures to arrive at values for the three gifts in question. He failed, however, to consider the depressing effect on value that marketing the large volume of materials here would have. See Maurice Jarre,supra;Estate of David Smith,57 T.C. 650, 658 (1972). Further, Mr. Luboviski's fee for making the appraisals was based on a percentage of the values arrived at. While we are not questioning Mr. Luboviski's integrity, we cannot ignore the fact that a motive existed to arrive at high values. This does not mean that the percentage fee arrangement invalidates the appraisal, but rather it simply means we must view the appraisal with added caution. The appraisal of Mr. Dolan, petitioner's second expert, must also be discounted. We cannot determine the relevant time to which the values arrived at apply. That is, the values arrived at may be 1973 values (the time of the appraisal) and not values at the time of the contributions. Further, while we recognize the difficulty in assessing *104 a man's popularity or the popularity of his works, we nonetheless think Mr. Dolan has relied too heavily on the ASCAP rating system as a measure of petitioner's popularity. Also, Mr. Dolan, like Mr. Luboviski, did not consider the depressing effect the large quantity of material here would have on market value. Finally, we think it important to mention the use by all expert witnesses of "comparable sales." Mr. David was compared to Beethoven, Igor Stravinsky, Cesar Franck, and Sibelius, as well as Leonard Bernstein, Elmer Bernstein, George Gershwin, Jerome Kern, Cole Porter, Richard Rodgers, Oscar Hammerstein, Katharine Hepburn, Walt Disney, Noel Coward, Sarah Bernhardt and many others. In all, such comparisons have not been overly helpful. In some instances they helped demonstrate the existence of a market for materials similar to those donated by Mr. David. But most often the reasons why the appraisers felt the "comparable sales" were comparable was not at all clear. We have found reasons to discount the testimony of all appraisers. More thorough, better reasoned appraisals would have tipped the scales more favorably to either party. After carefully considering all the *105 evidence in the record, we find that the materials donated in 1968, April 1969, and May 1969 had fair market values, at the time of contribution, of $42,000, $20,800 and $15,200, respectively. Decision will be entered under Rule 155. Footnotes
1. This listing is not intended to be representative of either Mr. David's works or the material donated.↩
2. The parties agree that the front page of the appraisal report states a total value of $66,480, but that this is a typographical error. The correct appraised value is $100 less, as stated in the text.↩
3. See Maurice Jarre,64 T.C. 183↩ (1975).
4. The use of the term "comparable" by all experts does not mean "equivalent." Rather, comparisons are made between petitioner and other composers whose material has actually been sold. The value of petitioner's materials may be more or less than the materials of other composers depending on how favorably petitioner "compares" to those other composers. ↩
5. We note that in some cases the catalogs used listed only offering prices for materials and did not record actual sales.↩
6. The two donations made in 1969 were valued together.↩
7. See, for example, Lawrence v. United States, an unreported opinion at 35 AFTR 2d 75↩-560, 75-1 USTC [*] 9165 (D.C.Calif. 1974).
8. Respondent has valued the two separate donations made in 1969 together.↩
9. cf. Otto Kerner, Jr.,T.C. Memo. 1976-12↩.
10. This does not mean respondent's experts cannot, through research, accurately evaluate the market for and the value of the donated materials. It is simply a factor we have considered in reaching our decision.↩